UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
JOE BALTAS,                      :
JASON GOODE,                     :
KENYON L. JOSEPH PELLOT-         :
     CASTELLANO,                 :
RICHARD RICE,                    :
YARDLEY DAVIS,                   :
PHILIP RIVERA,                   :
NOAH GLADDING,                   :
PETER TARASCO,                   :
THOMAS DELEO and                 :
JOSE ORTIZ,                      :
                                 :
     Plaintiffs,                 :
                                 :
v.                               :   Case No. 3:17-cv-242(RNC)
                                 :
CAROL CHAPDELAINE,               :
GIULIANNA MUDANO and             :
ANGEL QUIROS,                    :
                                 :
     Defendants.                 :
```

RULING AND ORDER

In 2017, inmates in the custody of the Connecticut
Department of Correction ("DOC") at MacDougall-Walker
Correctional Institution ("MWCI") brought this action under
42 U.S.C. § 1983 against DOC officials in their individual
and official capacities seeking damages and injunctive
relief based on alleged violations of their rights under
federal and state law arising from their confinement in Q-
Pod, a housing unit at MWCI.  Named as defendants were the
officials responsible for the operation of Q-Pod at the

time: Carol Chapdelaine, who served as Warden of MWCI;
Guilianna Mudano, who served as Deputy Warden; and Angel
Quiros, who served as DOC's District Administrator.

Plaintiffs alleged that Q-Pod, although nominally a
general population housing unit, actually functioned as an
administrative detention unit.  Plaintiffs alleged that
while in Q-Pod, they were denied privileges in
contravention of DOC Administrative Directives ("DOC
A.D."), specifically, DOC A.D. 9.4, which authorizes
various types of restrictive housing units, and DOC A.D.
9.5, which governs the disciplinary process.  They further
alleged that they were housed in Q-Pod for up to a year or
more at the "whim" of prison officials without the benefit
of procedural safeguards.  Plaintiffs claimed that as a
result of their confinement in Q-Pod, each of them had been
deprived of certain constitutional rights, with the
knowledge and approval of the defendants, specifically: (1)
the Eighth Amendment right to be free from cruel and
unusual punishment; (2) the Fourteenth Amendment right to
due process of law; (3) the First Amendment right to access
the courts; and (4) the First Amendment right to the free

exercise of religion.[1]  In addition, the complaint alleged violations of the Connecticut Constitution and state statutes.

The defendants denied the allegations of the amended complaint and pleaded defenses of qualified immunity and mootness.  Cross-motions for summary judgment were filed and argued and the case has been effectively stayed pending a ruling on the motions.

The defendants seek summary judgment on all the federal causes of action in the amended complaint.  They argue that the admissible evidence in the record would not permit a jury to find in favor of any of the plaintiffs on any of those causes of action.  They further argue that, at a minimum, they are protected by qualified immunity under § 1983.  Finally, they argue that the claims for injunctive relief are moot.  I conclude that to the extent any of the plaintiffs may have a viable claim under § 1983, qualified immunity applies.  I also conclude that the claims for injunctive relief are moot.  Accordingly, the defendants'

---

[1] Plaintiffs also invoke the Fourth and Fifth Amendments.  In substance, the Fourth Amendment claim is duplicative of the Fourteenth Amendment procedural due process claim, so it is not discussed separately in the text.  The Fifth Amendment claim is not discussed because it does not apply to the matters at issue.

motion is granted with regard to the federal claims,
plaintiffs' motion is denied, and the state law claims are
dismissed without prejudice.

I.    Background

    Based on the summary judgment record, the following
matters appear to be undisputed.  MWCI is a high security,
level 4/5 facility.  It provides a highly structured
environment for long-term sentenced offenders, protective
custody offenders, and high bond unsentenced offenders.  At
the pertinent time, it had a population of approximately
1900 inmates.

    Q-Pod is a housing unit located in the MacDougall wing
of MWCI.  Established in 2003, it has been used to house
inmates who are transitioning from more restrictive
conditions of confinement, such as punitive segregation,
back to general population.  Q-Pod has been the subject of
prior cases brought by inmates under § 1983.  See, e.g.,
Galarza v. Erfe, No. 3:18-cv-663(JAM), 2019 WL 8756874 (D.
Conn. April 30, 2019)(denying Q-Pod inmate's motion to
reopen action under § 1983 for failure to show plausible
grounds for relief for any constitutional claim); Harnage
v. Brighthaupt, No. 3:12-cv-1521, Ruling On Motion to

Dismiss In Part, ECF 42 (D. Conn. Feb. 12, 2014)(dismissing Q-Pod inmate's Eighth Amendment conditions-of-confinement claim and Fourteenth Amendment procedural due process claim); <u>Shakur v. Sieminski</u>, 3:07-cv-1239(CFD), 2009 WL 2151174 (D. Conn. July 15, 2009)(dismissing Q-Pod inmate's Eighth Amendment conditions-of-confinement claim).[2]

There are 60 cells in Q-Pod, each one designed for two people.  The cells are divided for administrative purposes into 4 groups of 15 cells each.  This arrangement enables prison officials to separate inmates for safety and security reasons by placing them in different groups.  Each cell throughout the unit has a toilet with a timer that limits the number of consecutive flushes.[3]  The unit has a medical assessment room.  The outdoor recreation yard attached to the unit includes a full-length basketball court.  There is no television.

---

[2] <u>Shakur</u> provides a detailed description of Q-Pod, which at the time was called "Q-Unit."

[3] While the exact intervals on the timer are in dispute, the official notice sent to inmates when the timers were installed reads as follows: "Be advised you can flush the toilet two times in five minutes.  You must wait five minutes before flushing again.  If you try to flush a third time before the ten minute period the toilet will lockout for 30 minutes.  After 30 minutes the cycle will reset to normal operation."  ECF 61-1 at 12.

Inmates in Q-Pod are generally housed with a cellmate and permitted daily visitation.  Meals are provided to inmates in their cells.[4]  Inmates recreate in the outdoor recreation yard 15 cells at a time (i.e. 30 inmates per session).  When the plaintiffs were housed in Q-Pod, they were not given access to group religious services with the general population, although that has since changed.

Q-Pod inmates have fewer privileges than general population inmates.  Authority for this disparity in privileges is unclear, but may be found in DOC A.D. 9.4.6, which provides that "[a]n inmate on restrictive housing status shall not be entitled to access to programs or privileges afforded an inmate in general population."  In any event, the stated purpose of the disparity in privileges is to motivate inmates to work their way out of Q-Pod by complying with prison rules and regulations. "Correctional experience has demonstrated that it is an effective correctional tool to disincentivize inmates from

---

[4] The parties disagree as to why inmates in Q-Pod are fed in their cells.  Defendants argue that this policy arises from the need to separate inmates due to safety and security concerns. Plaintiffs claim that there were no separation issues while they were housed in Q-Pod and that defendants conflate security issues in the MacDougall and Walker wings of MCWI.

getting tickets or disciplinary reports."  <u>See</u> Plfs' Local
Rule 56(a)(2) Statement, ECF 69, at 2 ¶9, admitting Defs'
Local Rule 56(a)(1) Statement, ECF 56-2, at 2 ¶9.[5]

 The following matters are disputed.  Plaintiffs allege
that when they were in Q-Pod, medical and mental health
services were provided only within the unit itself (if at
all), rather than in the main building, where general
population inmates receive services.  Defendants state that
like general population inmates, Q-Pod inmates go to the
main building for medical and mental health services; the
medical assessment room in Q-Pod is available for use in
emergencies.  Plaintiffs further allege that when they were
in Q-Pod, inmates were allowed to go to the library in the
main building just once a month, in contrast to general
population inmates, who could go once a week.  Defendants
state that Q-Pod inmates were able to access the library
every other week if they signed up in advance.

 Toilet-related issues are also disputed.  Defendants

---

[5] In 2004, soon after Q-Pod opened, the U.S. Department of
Justice, National Institute of Corrections, issued a report
commending DOC's "Close Custody Phase Program" at MWCI.  <u>See</u>
Classification of High-Risk and Special Management Prisoners, A
National Assessment of Current Practices, at 51, available at
http://www.nicic.org.

say that toilets all over MWCI have timers due to an
agreement with the Town of Suffield related to water usage;
plaintiffs say that toilets in other parts of the facility
did not have timers when they were in Q-Pod.  Plaintiffs
also allege that Q-Pod was the only unit where DOC staff
could shut off inmates' water and that some (unidentified)
correctional Officers sometimes shut off inmates' water for
hours.

Finally, the parties dispute what determined the amount
of time plaintiffs stayed in Q-Pod.  Defendants state that
the duration of a plaintiff's stay depended on the
disciplinary ticket he received: a ticket for a Class A
violation resulted in a stay of 90 days; a Class B ticket
resulted in a stay of 60 days.  Plaintiffs say the duration
was always longer than 90 days.  Defendants counter that
new violations of prison rules reset the clock for a
plaintiff's stay in Q-Pod, as prison officials noted in
response to one of plaintiff Baltas's grievances.  See Pl.
Ex., ECF 47-3 at 17, 40.

II.  Legal Standard

"Summary judgment is proper only when, construing the
evidence in the light most favorable to the non-movant,

'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).  Summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The non-moving party may defeat summary judgment by pointing to a genuine dispute of material fact but may not do so through conclusory allegations, unsubstantiated speculation, or inadmissible evidence.  See F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010).  "The mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment."  Zigmund v. Foster, 106 F. Supp. 2d 352,

356 (D. Conn. 2000) (brackets omitted) (quoting <u>Greene v.
Ga. Pardons & Parole Bd.</u>, 807 F. Supp. 748, 750 n.5 (N.D.
Ga. 1992)); <u>see also</u> <u>Saji v. Nassau Univ. Med. Ctr.</u>, 724 F.
App'x 11, 15 (2d Cir. 2018) (summary order) (holding that a
plaintiff "must offer some hard evidence showing that
[their] version of the events is not wholly fanciful"
(quoting <u>D'Amico v. City of N.Y.</u>, 132 F.3d 145, 149 (2d
Cir. 1998)). "The mere existence of a scintilla of
evidence in support of the plaintiff's position will be
insufficient." <u>Anderson</u>, 477 U.S. at 252.

III. <u>Discussion</u>

A. <u>Eighth Amendment</u>

Plaintiffs claim that their rights under the Eighth
Amendment were violated as a result of their placement in
Q-Pod in that they were: (1) denied group meals, group
exercise and other group activities providing opportunities
to socialize; (2) denied vocational training, job
assignments, and education; (3) deprived of adequate
medical care; (4) deprived of court-ordered drug and
alcohol counseling; and (5) deprived of access to toilets
without timers.

The Eighth Amendment is concerned with "[a prisoner's]

basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989). "[A] prison official violates the Eighth Amendment only when" he or she causes a deprivation that is "sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "Only 'deprivations "denying the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

In accordance with these principles, plaintiffs' Eighth Amendment claim requires that they prove (1) an "objectively, sufficiently serious . . . denial of the minimal civilized measure of life's necessities" and (2) a "sufficiently culpable state of mind" on the part of the responsible official. Willey v. Kirkpatrick, 801 F.3d 51, 66 (2d Cir. 2015). The deprivations at issue here do not meet the first prong. See Galarza v. Erfe, 2019 WL 8756874, *3 (Q-Pod inmate's allegations of no communal meals, 45-minute limit on recreation time, non-availability of programs outside of cell, and correctional officers'

loud walkie-talkies disrupting sleep failed to meet first
prong); Shakur, 2009 WL 2151174, *6 (rejecting claim that
restrictive conditions in Q-Pod constituted cruel and
unusual punishment).

At oral argument, plaintiff's counsel explained that
plaintiffs' lack of access to group meals, group exercise
and other group activities while in Q-Pod resulted in a
form of debilitating isolation.  "Confinement . . . in an
isolation cell is a form of punishment subject to scrutiny
under Eighth Amendment standards."  Hutto v. Finney, 437
U.S. 678, 685 (1978).  But plaintiffs do not allege that
any of them was held in isolation.  Rather, each plaintiff
had a cellmate, was permitted daily visits and could
recreate up to two hours a day with many others.  Given
this level of social contact, plaintiffs' lack of access to
group meals, group exercise and other group activities did
not impose a level of isolation sufficient to support a
constitutional claim.  Cf. Tavares v. Amato, 954 F. Supp.
2d 79, 92 (N.D.N.Y. 2013) (noting that administrative
segregation conditions are generally insufficient to
establish Eighth Amendment violations).

Deliberate indifference by prison officials to a

prisoner's serious medical or mental health needs
constitutes cruel and unusual punishment.  <u>See</u> <u>Slavone v.</u>
<u>New York State Dep't of Corr. Servs.</u>, 719 F.3d 127, 138 (2d
Cir. 2013).  However, "not every lapse in medical care is a
constitutional wrong."  <u>Salahuddin</u>, 467 F.3d at 279.  To
prevail on a claim of deliberate indifference in violation
of the Eighth Amendment, an inmate must demonstrate (1)
that his need for medical care was objectively,
sufficiently serious, and (2) that the defendant failed to
provide necessary care despite being aware of a substantial
risk that the inmate would suffer serious harm as a result.
Plaintiffs do not specifically allege (or offer evidence to
prove) any instance in which any of them was denied access
to needed medical or mental health care.  Rather, they
state that "many times the offender would be denied medical
treatment" and that with regard to mental health treatment,
"[t]here was not any confidentiality."  ECF 69 ¶ 36.  These
allegations are insufficient to support a claim of
deliberate indifference.

The absence of specific allegations of harm (and lack
of supporting evidence), also undercuts the Eighth
Amendment claim insofar as it is based on denial of access

to drug and alcohol counseling.  Plaintiff Rivera claimed
in an inmate request form that he needed to be in a drug
treatment program to become eligible for parole but was
being denied entry into the program because he was in Q-
Pod.  Pl. Ex., ECF 47-4, at 20.  DOC's response to Rivera's
grievance indicates that he was barred from the program
because of his disciplinary report rather than by his
housing status per se.  Id.  Delayed eligibility for parole
is not a deprivation of basic human needs and does not
violate the Eighth Amendment.

Plaintiffs' allegation regarding toilet timers does not
support an Eighth Amendment claim.  Temporary deprivations
of toilet use that do not result in serious physical harm
or contamination do not rise to the level of a
constitutional violation.  Harvin v. Chapdelaine, No. 3:16-
CV-1616(VAB), 2017 WL 3725611, at *11 (D. Conn. Aug. 29,
2017) (collecting cases).

Finally, plaintiffs' lack of access to jobs,
educational programs and vocational training while in Q-Pod
does not support an Eighth Amendment claim.  See Galarza v.
Erfe, 2019 WL 8756874, *3 (non-availability of programs in
Q-Pod did not provide plausible ground for Eighth Amendment

claim).

Defendants argue that even assuming an Eighth
Amendment violation could be found on the basis of the
record here, they are entitled to qualified immunity.  I
agree.

Qualified immunity shields government officials from
claims for damages under § 1983 "insofar as their conduct
does not violate clearly established statutory or
constitutional rights of which a reasonable person would
have known."  Farid v. Ellen, 593 F.3d 233, 244 (2d Cir.
2010) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818
(1982) (internal quotation marks omitted)).  To overcome a
defense of qualified immunity, a plaintiff must show that
(1) the defendant violated a constitutional right, and (2)
the right at issue was clearly established at the time of
the defendant's conduct.  Pearson v. Callahan, 555 U.S.
223, 232 (2009).  "A clearly established right is one that
is 'sufficiently clear that every reasonable official would
have understood that what he is doing violates that
right.'"  Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting
Reichle v. Howards, 566 U.S. 658, 664 (2012)).  To
determine whether a right was clearly established, courts

in this circuit consider "Supreme Court decisions, [Second Circuit] decisions, and decisions from other circuit courts." Simon v. City of New York, 893 F.3d 83, 92 (2d Cir. 2018). "A right must be defined with reasonable specificity and is clearly established only if the relevant case authority is directly on point or clearly foreshadows a ruling recognizing the right." Galarza v. Erfe, No. 3:18-cv-663 (JAM), 2020 WL 5501239, *4 (D. Conn. Sept. 11, 2020), citing Sloley v. VanBramer, 845 F.3d 30, 40 (2d Cir. 2019).

Plaintiffs have not identified relevant case authority showing that the restrictive conditions they experienced in Q-Pod violated the Eighth Amendment. They cite no decision of the Supreme Court, Second Circuit or other circuit courts suggesting that the conditions were objectively, sufficiently serious to rise to the level of cruel and unusual punishment. Moreover, the decision in Shakur rejecting the plaintiff's Eighth Amendment claim gave the defendants reason to believe that the conditions of confinement in Q-Pod did not violate the Eighth Amendment. See also Galarza v. Erfe, No. 3:18-CV-00663 (JAM), 2019 WL 8756874, *3 (D. Conn. Apr. 30, 2019) (inmate's allegations

concerning conditions of confinement in Q-Pod failed to provide plausible ground for Eighth Amendment claim).

B. Fourteenth Amendment

i. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment protects inmates against deprivation of certain liberty interests without procedural safeguards.  A prisoner has a right to procedural protection when (1) the state has created a liberty interest in a statute or regulation and (2) deprivation of that interest results in "atypical and significant hardship in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).[6]  Accordingly, to prevail here, plaintiffs must establish both that their confinement in Q-Pod imposed an atypical and significant hardship under Sandin, and that the state granted them, by regulation or statute, a protected liberty interest in remaining free from

_____

[6] Sandin involved an inmate, Demont Connor, who was confined in disciplinary segregation for 30 days.  During his 30 days in disciplinary segregation, Connor was confined to his cell except for 50 minutes each day when he was permitted to exercise and shower while isolated from other inmates and constrained by leg irons and waist chains.  The Court concluded that Connor's confinement in disciplinary segregation for 30 days did not impose "atypical and significant hardship."

confinement in Q-Pod.  See Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996).

The record is insufficient to permit a reasoned determination of whether plaintiffs can prove a state-created liberty interest.  They point to DOC A.D 9.5, which sets out the available penalties for disciplinary violations.  See ECF 60.  They contend that this regulation gives prisoners a liberty interest in being free from penalties that are not expressly authorized.  Defendants have not addressed this contention directly.  See ECF 56-1 at 21-22.  But they do deny that the conditions in Q-Pod imposed a penalty.  Though the record is insufficient to permit a reasoned finding, I will assume for present purposes that plaintiffs can prove they had a state-created liberty interest in avoiding assignment to Q-Pod.

Whether plaintiffs can prove that the conditions in Q-Pod imposed atypical and significant hardship is also unclear.  The inquiry hinges on two factors: the duration of the plaintiff's confinement in Q-Pod and the extent to which the conditions in Q-Pod differed from the conditions in general population.  See Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004); Colon v. Howard, 215 F.3d 227, 231

(2d Cir. 2000).  Some of the plaintiffs were confined in Q-Pod for lengthy periods of time, so the duration factor weighs in their favor.  However, the conditions in Q-Pod were not dramatically different from the conditions in general population.

 In assessing the conditions in Q-Pod for purposes of the Sandin claim, guidance can be drawn from other cases brought in this court by Q-Pod inmates seeking relief under Sandin.  In the first case, filed in 2012, Judge Thompson summarized the plaintiff's allegations with regard to the conditions in Q-Pod as follows:

> The plaintiff alleges that he is denied communal meals, must shower in the evening rather than being allowed to choose to shower in the morning or evening, and can access the prison library only one day per week. The plaintiff is afforded two hours out-of-cell time per day, one hour of recreation in the morning and one hour for showers and telephone use in the evening. He is not allowed the additional hour of exercise in a large outdoor yard or, during inclement weather, in the gymnasium that other general population inmates are afforded. The housing unit does not have a television in the day room or a typewriter for the unit.

Ruling on Motion to Dismiss in Part, Harnage v. Brighthaupt, No. 3:12-cv-1521 (AWT) (D. Conn. Feb 12, 2014), ECF 42 at 14.  Judge Thompson observed that while these conditions may have been harsher than the conditions

in other housing units, "the plaintiff had alleged no facts describing any condition that an inmate should not expect to undergo by virtue of his incarceration." Id. at 18. Accordingly, the plaintiff could not meet the significant and atypical standard of Sandin.

In the second case, filed in 2015, the same plaintiff alleged that while he was in Q-Pod, "prison officials subjected [him] to limited access to library resources, shorter recreation periods, restrictions on photocopying services and no access to intramural sports and communal dining.  In addition, religious and medical services were performed within the unit instead of outside of the unit." Ruling on Motion to Dismiss, Harnage v. Chapdelaine, 3:15-cv-1034 (AWT) (D. Conn. Mar. 28, 2017), ECF 25 at 2-3 ("Harnage II").  Judge Thompson again concluded that the conditions alleged by the plaintiff did not meet the Sandin standard and he was therefore "not entitled to procedural due process prior to his placement in Q-Pod." Id. at 10.

Plaintiffs' allegations concerning lack of access to jobs, vocational training and classroom instruction go beyond the allegations in the Harnage cases.  But the record does not support a finding that this lack of access

was a marked departure from the ordinary incidents of prison life.  With regard to jobs, plaintiffs admit that MWCI had a wait list for general population inmates who wanted jobs.[7]  They also do not dispute that, with the possible exception of "tiermen" in Q-Pod, inmates with disciplinary records did not have jobs.  Id. ¶ 30.  With regard to other programming, the record indicates that eligibility depended on an inmate's disciplinary record, rather than his housing assignment.  See Pl. Ex., ECF 47-4 at 20 (grievance from plaintiff Rivera claiming that he had been denied program participation because of his placement in Q-Pod; response stating that program participation required a clean disciplinary record for 120 days after a Class A violation).

The allegations in the present case also go beyond the allegations in the Harnage cases with regard to medical and religious services.  Plaintiffs allege that services were provided only within Q-Pod, the same allegation made in Harnage II.  But plaintiffs also assert that some Q-Pod inmates were denied access to medical care and religious

_____

[7] At the pertinent time, there were approximately 1900 inmates at MWCI and only about 500 jobs.  ECF 69 ¶ 31-32.

services even within the unit, in other words, they were wholly denied access to medical and religious services. These allegations were not made in the <u>Harnage</u> cases.

Viewed most favorably to plaintiffs, the record does not permit a finding that any of them was ever denied access to needed medical care while in Q-Pod.  The assertion that "many times" unidentified "offenders" were denied needed medical care is conclusory in nature.  There is no allegation or evidence that any of the plaintiffs had a need for medical treatment while in Q-Pod, sought treatment and was denied treatment.

Plaintiffs' claim with regard to the alleged denial of access to religious services is better supported. Plaintiff Baltas's affidavit states that he could not smudge in his cell.  His statement is contradicted by contemporaneous documentary evidence.  <u>See</u> Pl. Ex., ECF 47-3 at 21 (grievance by plaintiff Baltas claiming that he was restricted from practicing his Native American religion by smudging with the rest of the general population; response by officials stating that inmates in Q-Pod may dry smudge in their cells and that the "Native American Chaplin [sic] does a service with the inmates in Q unit.").  But

plaintiff Tarasco's affidavit makes a similar claim
regarding Native American religious services.  He alleges
that he "was not allowed to attend [his] religious
practices or purifications at all" and that as a result of
his persistent complaints about this restriction, he "was
eventually removed from Q-Pod."  ECF 47-5 at 6.  Tarasco's
claim is buttressed by the affidavit of plaintiff
Castellano, which recounts a conversation between Tarasco,
a Native American Services Alder, and a Q-Pod counselor,
which Castellano overheard.  According to Castellano's
account, Tarasco asked the alder about accessing services,
including a sweat lodge and smudging.  The counselor  said
the Warden and Deputy Warden had been informed of Tarasco's
request and were looking into whether services could be
provided.  Both the counselor and the alder said they were
uncertain whether any services could be provided to Tarasco
in Q-Pod due to staffing issues.  ECF 47-5 at 7-8.

Viewing the record most favorably to plaintiffs, the
affidavits of Baltas, Tarasco and Castellano, in
combination, raise a triable issue whether Baltas and
Castellano were unable to smudge or attend sweat lodge

services in Q-Pod.  But the duration of the deprivation remains unclear.

As to the amount of time plaintiffs spent in Q-Pod, the record, viewed most favorably to the plaintiffs, shows the following:

Baltas was in Q-Pod from April 9, 2015 to May 12, 2015; then from May 29, 2015 to October 21, 2015; then from November 13, 2015 to February 24, 2016; then from April 8, 2017 to July 3, 2016;

Rivera was in Q-Pod for 9 months;

Tarasco was in Q-Pod for 3 months and a few days;

Rice was in Q-Pod from March 28, 2016 to July 6, 2016; And

Gladding was in Q-Pod for longer than 6 months consecutively and ultimately spent a total of more than one year in Q-Pod.[8]

Based on this record, I cannot exclude the possibility that Baltas, Rivera and Gladding may be able to prove that they were confined in Q-Pod without procedural protections for a longer period than permitted by the Fourteenth

---

[8] The record does not disclose the duration of the other plaintiffs' confinement in Q-Pod.

Amendment.  A decision by Chief Judge Underhill shows that
the claims of these plaintiffs have arguable merit.  In
Garcia v. Semple, No. 3:18-cv-1226, 2019 WL 5597771 (D.
Conn. Oct. 30, 2019), the plaintiff was placed on high
security status and moved to a cell in Q-Pod, where he
remained for 89 days.  The plaintiff's affidavit described
conditions similar to the ones at issue here.  See No.
3:18-cv-1226, ECF 1 at ¶ 167.  Judge Underhill concluded
that the plaintiff had a plausible procedural due process
claim.  See 2019 WL 5597771, *13.[9]

However, I agree with the defendants that they are
entitled to qualified immunity.  Plaintiffs cite no
relevant case authority clearly establishing that confining
them in Q-Pod without procedural safeguards for the periods
at issue violated the Fourteenth Amendment.  At the
pertinent time, relevant case authority indicated that
confinement in more severe conditions for months at a time
would not constitute atypical and substantial hardship
under Sandin.  See Frazier, 81 F.3d at 317-18 (120 days in
segregation followed by 30 days loss of recreation and

---

[9] The case was later dismissed for failure to prosecute.  See ECF
35.

other privileges did not impose atypical and significant
hardship).  Moreover, in the Harnage cases, the plaintiff
alleged that he had been in Q-Pod for four or five months
at a time.  See Ruling on Motion to Dismiss, Harnage v.
Chapdelaine, 3:15-cv-1034 (AWT) (D. Conn. Mar. 28, 2017),
ECF 25 at 3.  Accordingly, the dismissal of the procedural
due process claims in those cases signaled that the
conditions in Q-Pod were not so different from the ordinary
incidents of prison life as to support a claim under
Sandin.

I also agree with defendants' argument that
plaintiffs' claims for injunctive relief under Sandin are
moot.  ECF 56-1 at 28-30.  At the time this motion was
briefed, none of the plaintiffs remained in Q-Pod, and only
two of them remained at MWCI.  See id. at 29-30.  Now, it
appears, four plaintiffs are incarcerated at MWCI, but it
is unclear whether any of them are housed in Q-Pod.  When
an inmate is moved from the facility that is the site of
his claim for injunctive relief, the request is generally
moot.  Young v. Coughlin, 866 F.2d 567, 568 n.1 (2d Cir.
1989); see also Candelaria v. Coughlin, 787 F. Supp. 368,
378 (S.D.N.Y.), aff'd 979 F.2d 845 (2d Cir. 1992) ("Because

plaintiff has now been transferred to another facility, we dismiss his claim for injunctive relief as moot.").

ii. Grievance Process

Plaintiffs claim that defendants violated their due process rights by failing to properly administer the grievance process.  More specifically, plaintiffs claim that their grievances were not addressed at all or were not addressed in a timely manner. Am. Compl., ECF 14 ¶ 47. They also object to the practice of resolving grievances by "compromising" them, which did not allow for the usual appeals process. See, e.g., Pl. Ex., ECF 47-4 at 14.  The record does not support a viable due process claim. "Although state laws may in certain circumstances create a constitutionally protected entitlement to substantive liberty interests, state statutes do not create federally protected due process entitlements to specific state-mandated procedures."  Holcomb v. Lykens, 337 F.3d 217, 224 (2d Cir. 2003) (citations omitted); see Kalican v. Dzurenda, 583 F. App'x 21, 22 (2d Cir. 2014) (summary order) ("Grievance procedures, which are creatures of state law, are not interests independently protected by the Constitution . . . ."); see also Green v. Martin, 224 F.

Supp. 3d 154, 178 (D. Conn. 2016) ("Prisoners have no
constitutionally protected right to have prison officials
comply with grievance procedures or even to respond to
grievances."). Accordingly, defendants are entitled to
summary judgment on this claim.

C. First Amendment

i. Access to the Courts

Plaintiffs allege that defendants violated their right
to access the courts by interfering with their use of the
library and the typewriter.[10] The record, viewed most
favorably to plaintiffs, does not raise a triable issue
with regard to this claim. "[T]here is . . . no
constitutional right to a typewriter as an incident to the
right of access to the courts." Taylor v. Coughlin, 29
F.3d 39, 40 (2d Cir. 1994) (quotation marks omitted)
(quoting Wolfish v. Levi, 573 F.2d 118, 132 (2d Cir. 1978),

---

[10] Plaintiffs also assert that they were stymied in bringing
grievances, in violation of the First Amendment. There is no
right to a grievance procedure under the First Amendment.
Boddie v. Alexander, 356 F. App'x 438, 440 (2d Cir. 2009)
(summary order). "[T]he First Amendment functions only to
prohibit the government from obstructing the right to petition."
Id. "Because [plaintiffs] allege[], in essence, that the
[defendants] failed to assist [their] ability to raise a
grievance — not that the [defendants] obstructed [their] ability
to raise a grievance — [plaintiffs have] failed to state a
cognizable First Amendment claim." Id. at 441.

rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520 (1979)).

As for library access, the parties dispute how often Q-Pod inmates could visit the library.  Again viewing the record in the light most favorable to the plaintiffs, I will assume that the plaintiffs had access to the library only once per month, unlike general population inmates on other units who accessed the library once per week.  While Bounds v. Smith requires adequate access to a law library as a part of the right to access the courts, 430 U.S. 817, 829 (1977), plaintiffs still must demonstrate inadequate access resulting in "actual injury."  Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001) ("Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,' prisoners must demonstrate 'actual injury' in order to have standing." (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996) (internal quotations omitted)).  In other words, plaintiffs must show that their lack of access to the law library was in fact inadequate

and impeded their access to the courts.

The record does not support a finding of actual injury as a result of any limited access to the library or typewriters. In particular, the record does not support a finding that "the alleged shortcomings in the library or legal assistance program hindered [any plaintiff's] efforts to pursue a legal claim." Bourdon v. Loughren, 386 F.3d 88, 93 (2d Cir. 2004). Therefore, the defendants are entitled to summary judgment on this claim.

### ii. Free Exercise of Religion

Plaintiffs claim that they were prevented from engaging in religious practices while in Q-Pod in violation of the First Amendment. As discussed above, Baltas and Tarasco may be able to prove that they were not allowed to engage in Native American religious practices in Q-Pod. Even if they were permitted to smudge, they might still be able to prove that they were deprived of a "constitutional right to participate in congregate religious services." Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993). In Salahuddin v. Coughlin, 999 F. Supp. 526, 538-39 (S.D.N.Y. 1998), the court held that there must be individualized findings to justify depriving a particular

inmate of congregate services.  In other words, mere
segregation status on a particular unit is not enough.  See
also LaReau v. MacDougall, 473 F.2d 974, 979 n.9 (2d Cir.
1972) (noting that not all prisoners in segregation
"lawfully can be prevented from attending church services
in the chapel. Not all segregated prisoners are potential
troublemakers; so some discrimination must be made by
prison authorities among the inmates in the segregation
unit.").  Furthermore, this claim is distinguishable from
other cases that have declined to allow religious freedom
claims related to the Q-Pod to go forward. In Shakur v.
Sieminski, No. 3:07-cv-1239C, 2009 WL 2151174 (D. Conn.
July 15, 2009), summary judgment was granted on the First
Amendment claims of a prisoner in Q-Pod. However, in that
case, the plaintiff "[did] not allege . . . that he was
denied the ability to practice his religion or attend
congregate religious services." Id. at *7. Instead, he only
alleged that congregate services were "provided in Q-Unit,
instead of the main building." Id.  Here, Tarasco
specifically alleges that he was denied both the ability to
practice his religion and to attend congregate religious
services.

Nevertheless, I conclude that the defendants are entitled to qualified immunity.  No relevant case authority has been cited or found that addresses the First Amendment free exercise rights of inmates to participate in sweat lodge or smudging services.  See, e.g., Baltas v. Erfe, No. 3:19-cv-1820 (MPS), 2022 WL 4260672, *12 (D. Conn. Sept. 15, 2022) ("N either party has cited, and the Court is unaware of, any Second Circuit or U.S. Supreme Court precedent that specifically addresses an inmate's First Amendment right either to demand construction of a sweat lodge within a prison facility, or to transfer to a prison facility with sweat lodge access, to accommodate the inmate's free exercise of the Native American religion"); Buckles v. Crowe, 2021 WL 1341887, * 6 (D. Mont. Feb. 22, 2021) (finding based on a review of federal case law that there is "no clearly established constitutional right to access a sweat lodge in prison to practice the Native American religion").  In the absence of clear case law, qualified immunity applies to the claims of Baltas and Tarasco against the defendants in their individual capacities.  And their claims for injunctive relief are moot, as discussed earlier.

D. <u>State Law Claims</u>

Because summary judgment is properly granted on all the federal claims, the state law claims will be dismissed without prejudice.  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  <u>Kolari v. New York-Presbyterian Hosp.</u>, 455 F.3d 118, 122 (2d Cir. 2006) (alteration in original) (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988)).  In addition, "district courts may decline to exercise supplemental jurisdiction" where "the claim raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  In this case, it is unclear whether there are private rights of action for many of plaintiffs' state constitutional claims.  <u>See</u> <u>Binette v. Sabo</u>, 710 A.2d 688, 700 (Conn. 1998) ("Whether to recognize a cause of action for alleged violations of other state constitutional provisions in the future must be determined on a case-by-case basis.").  This counsels against exercising supplemental jurisdiction.  <u>See</u> <u>Lopez v. Smiley</u>, 375 F. Supp. 2d 19, 26 (D. Conn. 2005) (declining jurisdiction

over state constitutional claims, citing Binette and "federalism and comity concerns").  Accordingly, those claims are dismissed without prejudice to refiling in state court.  See Kolari, 455 F.3d at 124.

IV. Conclusion

Defendants' motion for summary judgment is granted with regard to the federal claims and plaintiffs' partial motion for summary judgment is denied.  The state law claims are dismissed without prejudice.  The Clerk may enter judgment and close the file.

So ordered this 30th day of September 2022.

                        /s/ Robert N. Chatigny
                        Robert N. Chatigny
                        United States District Judge